Royal Motors, Inc. v. Commissioner.
Royal Motors, Inc. v. Commissioner
Docket No. 5380.
United States Tax Court
1945 Tax Ct. Memo LEXIS 119; 4 T.C.M. (CCH) 777; T.C.M. (RIA) 45255; July 12, 1945
*119 Walter C. Shea, Esq., 700 Atlantic National Bank Bldg., Jacksonville, Fla., and P. W. Fisher, C.P.A., 1412 Barnett National Bank Bldg., Jacksonville, Fla., for the petitioner. F. L. Van Haaften, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined a deficiency against petitioner for the fiscal year ended May 31, 1941, as follows: Kind of Tax
Amount
Income Tax
$1,775.15
Declared Value Excess-
profits Tax
1,636.08
Excess Profits Tax
2,130.60
Total
$5,542.18
The petition alleges that the Commissioner erred in including in its gross income for the fiscal year the amount of $12,394.55, representing a reserve set up by a finance company as a credit to petitioner under the terms of an agreement with it. Findings of Fact Petitioner is a Florida corporation, engaged in the business of selling and distributing automobiles in the Jacksonville area. Its returns for the fiscal year ending May 31, 1941, were filed with the collector of internal revenue at Jacksonville, Florida. Its books were kept on an accrual basis. Petitioner took notes representing the unpaid purchase price of *120 some of the automobiles sold by it and certain service charges, which notes were discounted with or handled by finance companies. Commercial Credit Co. handled a substantial part of its paper under a "Reserve Agreement" signed by petitioner reading as follows: "1. We will sell to you, from time to time, acceptable notes, conditional sale contracts, chattel mortgages or lease agreements, herein called 'Notes', acquired by us from retail purchasers of new or used passenger and/or commercial automobiles, herein called 'Cars'. Notes will be for amounts computed in accordance with the applicable charts issued by you to us for use in territories in which we sell Cars. "2. You will set up the following reserves, for our account, based on the cash unpaid balance, (cash selling price of Cars, less down payment): - NEW CARS: 12 months or less - 1 1/2% on first $500.00 and 1/2% on excess over $500.00. Over 12 months - 2% on first $500.00 and 1% on excess over $500.00. USED CARS: Same reserve as on New Cars plus $7.00 (Minimum Used Car Reserve $10.00). No reserves are to be set up in respect to short term note, demonstrator or other unusual or special plans, announced by you from *121 time to time except as may be hereafter agreed upon. As of January 31st, July 31st, and October 31st, you will pay to us the amounts by which reserves set up under this and any other Agreements, heretofore executed by us, exceed 3% of the total balances outstanding on all Notes purchased from us, provided that no payments need be made by you so long as any indebtedness we may owe to you at the time of settlement above stated is unpaid, but such reserves may be held and applied by you against such indebtedness. "3. In consideration of the purchase by you of such acceptable Notes endorsed 'without recourse', and we agree that if you repossess or recover any Cars covered by said Notes, for any reason, we will, upon delivery to us at our place of business shown above, repurchase such Cars, as is, from you, for cash. If such Cars are tendered to us within 90 days after the maturity of the earliest instalment in respect thereto unpaid at the time of such delivery, or if you are required by law to keep such Cars for redemption, or for any other reason, or where Cars are involved in litigation or are held by or under the jurisdiction of any court or governmental agency for any period for *122 any reason, we will accept delivery of such Cars as soon as you can make delivery thereof notwithstanding that it may exceed the 90 day period above mentioned and we will pay you for such Cars, in cash, an amount equal to the unpaid balance owing on the Notes relating thereto. If you should be unable to repossess such Cars, within the 90 days after the default of any instalment of the Notes in respect thereto, and such default shall have continued during such period, we will purchase such Cars from you at such time as you can make delivery thereof and we will pay you therefor the value of the Cars, as is, at the time they are returned, such value to be determined in accordance with the appraisal clause of standard fire and theft policies. Until repurchased by us, you may store such repossessed Cars on our premises without cost, and our possession of such Cars shall be merely as a bailee with the duty to safely store for you and redeliver such Cars to you on demand. "4. If any Cars repurchased by us hereunder have suffered material damage directly resulting from one collision, because of which the purchasers have failed to pay for the Cars, necessitating repossession by you, you will *123 cause such damage to be repaired upon your written order, or will make allowance to cover the actual cost of repairing such damage, which shall include only the actual cost of parts and direct labor and shall not include any repairs or replacements, which are not the direct result of and necessitated by such collision. The cost to you of such repairs or allowance therefor shall not exceed - (a) the unpaid balance owing you on the Notes relating to such Cars, or, (b) the standard insurance appraisal 'as is' value of such Cars at the time of repossession, whichever is lower. If any car is covered by collision insurance, and the repairs thereto are made by us, you will allow to us such amount not covered by the insurance settlement, by reason of the deductible clause in the policy of insurance, as is necessary to cover the actual cost of the repairs, as aforesaid. "5. It is agreed that our loss, (if in excess of $1,000.00), arising out of Cars repurchased by us from you under this Agreement, and resold by us within 90 days from the date of delivery by you to us of such Cars, shall not exceed 3% of the aggregate principal amount of all Notes purchased by you during the respective 12 *124 month period, from the date hereof, in which the Notes in respect to such Cars were purchased by you from us, plus an amount, equal to the total reserve above mentioned, set up during the same period by you for us whether or not held by you or paid over to us. Such loss shall be determined by the difference between the amount we realize from the sale of such repossessed automobiles and the amount we pay you for the same. Upon request, we will furnish you with all desired information, and we will allow you to examine our records relating to such Cars, to assist in determining such limit of loss. "6. In making settlement for the repurchase of any repossessed Car as provided in Paragraph 3 hereof, or for any Car damaged by collision, as provided in Paragraph 4 hereof, if the down payment made by the purchaser of such Car was less than one-third of the cash delivered price of such Car, we also shall be liable for the difference between the down payment actually made by the purchaser and an amount equal to one-third of the cash delivered price of such Car, subject to credit for the proportionate amount of the shortage included in the instalments paid by the purchaser. Any losses sustained *125 by us as a result of inadequate down payments, as herein provided, shall not be taken into consideration in computing our losses as provided in Paragraph 5 hereof. "7. This agreement shall be irrevocable until all Notes purchased hereunder by you from us shall have been paid in full to you, and shall inure to the benefit of and bind you and our respective heirs, personal representatives, successors and assigns, and any company or organization subsidiary to or affiliated with you to whom you may assign this Agreement and Notes purchased from us hereunder and/or cause to purchase Notes from us as herein set forth. We hereby waive notice of non-payment, repossession, acceptance of this Agreement by you and all other notices to which we might otherwise be entitled by law." The agreement was accepted by Commercial Credit Co., October 10, 1937. As notes were transferred to Commercial pursuant to the above agreement it remitted to petitioner the cash selling price of the car, less down payment, and simultaneously credited a reserve account upon its books with the amount specified in the agreement, transmitting to petitioner a memorandum showing such credit. Petitioner thereupon credited *126 the amount shown by the memorandum to an account shown upon its books as "Dealers Reserve," an off-setting entry being shown in an account carried as "Reserve for Repossession." The credit in the "Dealers Reserve" on May 31, 1940 was $1,552.35 and on May 31, 1941 $13,378.08, of which latter amount $12,394.55 represented the credits from Commercial. The latter amount was included by respondent in petitioner's gross income. Opinion Petitioner had followed the practice of including in gross income the amounts received in cash from the finance company upon the dates specified in the agreement, i.e. January 31, July 31 and October 31, making appropriate entries at those times upon its books. Its theory was that the amounts were not properly accruable until then. Both parties indicate complete familiarity with the rationale of such cases as , and recognize that "keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income." Our question therefore is the narrow *127 one whether petitioner is correct in its contention made upon brief that "at no time during the taxable year * * * was there any right * * * to receive the amount in the reserve account and * * * whether any portion of the reserve would ever be payable to * * * [it] was uncertain and unascertainable." The following was given by one of the witnesses as a typical illustration of how the reserve was built up. Sale of automobile for $1200, $400 cash and $800 in deferred payments. Total of notes taken aggregating between $900 and $950, including interest, insurance and handling charges. $800 in cash paid over at once by Commercial to petitioner. If the notes executed by the purchaser were payable in 12 months then 1 1/2% on the first $500 ($7.50) plus 1/2% on $300 ($1.50) or an aggregate of $9.00 was credited to petitioner's reserve. If the notes were payable over 12 months, 2% on the first $500 ($10.00) plus 1% on $300 ($3.00) or an aggregate of $13.00 was credited to petitioner's reserve. The illustration is in accord with the agreement. Upon brief the parties discuss at length a memorandum opinion of this tribunal, mentioned by the Circuit Court of Appeals for the Third Circuit *128 in . In each of those cases there was a "marked similarity" in the facts noted by the court. "In the Beaudry case, an automobile dealer assigned to a finance company notes given him by his customers. Out of the gross financing charges made by the finance company on each note transaction a portion was credited on the books to an account called 'dealer's reserve' to take care of any losses that might result to the finance company from notes so purchased by it." In the Keasbey & Mattison case "Five of the seven percent charge made by the Finance Company was to go to the Finance Company as compensation for its financing services, and the balance (two percent) was to be placed in a reserve fund by the Finance Company to liquidate possible losses from uncollectible notes. The contract authorized the Finance Company to charge against the reserve fund any discounted notes of home owners delinquent for sixty days or more. It further provided that whenever the total reserve fund should exceed ten percent of the unpaid balance of the outstanding discounted notes such excess should be paid to the * * * [dealer] at its option *129 on January 3rd of each year of the life of the contract and that, upon termination of the agreement and when all installment notes discounted thereunder had been liquidated in full and all sums due the Finance Company had been paid, any balance remaining in the reserve fund was to be paid to the * * * [dealer]." Pointing out that in each of the two cases the amount in the reserve at no time during the taxable year had exceeded the specified percent of the unpaid notes which had been discounted, the court concluded that the taxpayer had correctly refrained from including in its gross income - its books being kept on an accrual basis - any part of the amount shown in the reserve. In an effort to bring itself within the rule of the cited cases petitioner urges upon brief that it "had no right to receive the money in the reserve account until all notes discounted were current and the amount in the reserve account exceeded three percent of the total balance outstanding on notes discounted * * * and in that event, on specified dates, * * * [it] was entitled to and had the right to receive only that amount in excess of three percent, subject to recapture by the finance company, however, *130 if the losses on the paper discounted exceeded the amount in the reserve account." We do not agree with petitioner's interpretation of the contract provisions; but if it were correct still petitioner has not shown that it is entitled to prevail. Two months had elapsed since the last settlement had been made with the finance company and the payments made by the makers in the interim were not shown. Moreover we have no evidence as to the aggregate amount of notes sold to the finance company, the amount unpaid at the end of the year, or the liability, if any, of the dealer to the finance company under the other provisions of the contract. Without evidence upon these points we should not be justified in overturning the Commissioner's determination. But we prefer not to resolve the issue upon a failure of proof. In our judgment an extant and sound opinion of this tribunal furnishes the answer. In , the petitioner and the same finance company with which petitioner dealt had signed a contract similar in essence although not identical in terms to that shown in our findings. The same sort of reserve was set up and the same obligations were assumed *131 by the parties. We pointed out, and the Circuit Court of Appeals for the Third Circuit in , recognized the soundness of our view, that the amounts placed in the so-called reserve were not true reserves but were nothing more than part of a plan set up by the finance company to provide for payment to the dealer of a portion of the purchase price of the notes. We concluded that the various credits to the reserve represented profit derived by the dealer from the sale of notes of automobile purchasers, which sale "was as much a part of the business carried on by petitioner as the sale. of the automobiles themselves." In that view there was thought to be no reason for concluding that the "profit from the sale of such notes is not accruable [by one keeping its books on an accrual basis] when the notes are sold." Petitioner's argument to the effect that the document under which its reserve was set up is similar to the agreements in the Beaudry and Keasbey & Mattison cases has been considered but is believed to be unsound. We are of the opinion that it is, in essence, the same agreement as the one set out in the findings in *132 Under each the reserve belongs absolutely to the dealer and is to be paid in cash or used to liquidate his indebtedness. The tri-annual settlements merely determine how and when the payment will be made. On the authority of the last-mentioned case it is held that respondent committed no error in determining the deficiency in tax. Decision will be entered for the respondent.